WILSON VS UNITED STATES.

Opinion delivered October 19, 1904.

1. *Murder—Evidence—Opinion of Physician as to Position of Body—Inadmissible.*

On a trial for murder, it was error to allow a physician to testify as to an examination of the body and wound and state his opinion as to the position of the deceased's arm at the time the wound was received; that being a question for the jury.

2. *Trial—Cross-Examination—Control of, in Discretion of Court.*

The control of the cross-examination is within the discretion of the court, and a ruling thereon will only be disturbed upon a clear showing of abuse of this discretion.

3. *Murder—Evidence—Improperly Admitted—Effect of.*

Where, in a murder trial, evidence of a conversation at which defendant was not present was improperly admitted, a conviction will not be reversed when such improper evidence seems to have had no influence with the jury.

4. *Appeal—Evidence—Objection Must Appear in Record.*

An alleged error in admission of testimony will not be considered where the record does not show any objections made and exceptions reserved at the trial.

5. *Murder—Instruction—Abstract Proposition of Law.*

An instruction covering an abstract proposition of law, not directly applicable to the facts in issue, but from which no injury could result to defendant, will not warrant a reversal.

6. *Murder—Aiding and Abetting—Instructions.*

On a trial for aiding and abetting in a murder, an instruction that if defendant had in good faith abandoned any intention to participate and was endeavoring to withdraw from the conflict, he should be acquitted was properly refused; for the instruction should have contained the provision that defendant must also have notified the principal of such withdrawal.

Appeal from the United States Court for the Northern District.

CHARLES W. RAYMOND, Judge.

John C. Wilson, convicted of manslaughter, appeals. Reversed.

The appellant in this case was indicted for the crime of murder on November 17, 1900, by the grand jury of the United States Court for the Northern District, sitting at Wagoner. On November 23, 1900, appellant, having been arraigned, entered a plea of not guilty, and thereupon the case was continued until the

next term of the court. On June 12, 1901, appellant filed application for a change of venue, and said application was sustained, and the venue of said cause was changed from Wagoner to Muskogee by order of Joseph A. Gill, judge. On September 17, 1901, said cause came on for trial at Muskogee, Ind. Ter., before C. W. Raymond, judge, and the trial was continued until its conclusion, when the jury returned the following verdict: "We, the jury duly impaneled and sworn in the above-entitled action, do find from the law and the evidence the within-named defendant, John C. Wilson, guilty of manslaughter, in manner and form as charged in the within indictment. Sam J. Haynes, Foreman." On November 26, 1901, the appellant filed his motion for a new trial, which motion on November 27, 1901, was overruled by the court, and on same day the court sentenced appellant to 10 years' imprisonment and a fine of $500, to which appellant excepted, and prayed an appeal to this court.

*Wm. M. Cravens*, for appellant.

*P. L. Soper* and *Wm. M. Mellette*, United States Attorneys.

TOWNSEND, J. It was the contention of the prosecution that Wm. Couch shot deceased, Riggles, without excuse or justification, and that appellant, Wilson, was present, aiding, abetting, and encouraging him in committing the act, and that the deceased, Riggles, was standing unarmed, with his hands behind him, at the time Couch shot him; and a number of witnesses were introduced who testified to that state of facts. On the other hand, the defendant introduced several witnesses, among whom was Couch, who fired the shot, that the deceased, Riggles, was near to and advancing on him (Couch) in a threatening manner with a piece of drawn scantling, and about to strike him with it, when he shot him. Hence one of the vital questions

in this case was, what was the position and attitude of the deceased, Riggles, at the time Couch shot him?

The first error assigned by appellant was the permission given by the court to the prosecution allowing Dr. J. W. Brazel, after his examination of the wounds received by the deceased, to state his opinion of the position of the arm of the deceased at the time he received the gunshot wound, and his reasons for that opinion. This was objected to by appellant, the objection was overruled by the court, and exception saved. The testimony of the doctor, to which objection was made and exception saved, was as follows: "Q. Doctor, did you make an examination of the bullet wound in the arm, with reference to how the arm was at the time the bullet entered? A. Well, yes; some examination. Q. Well, I will ask you now what, in your opinion as a surgeon, was the location of the arm at the time the bullet wound was received? Mr. Cravens: I object to that. My contention is that the doctor, taking it for granted that he was a surgeon, that he can locate the wounds, show where they were, give an accurate description of them; but the other is a reasoning that is to follow from the facts given by him, and to be worked out by the jury, not by him. He can describe the wound in every particular, but that is as far as he can go. The Court: The objection is overruled. Mr. Cravens: We except. Mr. Stuart: Q. What, in your judgment, was the position of the arm at the time the wound was received? A. My judgment is that the arm was slightly behind him and relaxed. Q. Now, doctor, you may state to the court and jury your reasons for that? Mr. Cravens: I object to that. The Court: The objection is overruled. Mr. Cravens: We except. The witness: My reason is that the arm did not correspond; that is, that it didn't make a straight opening through the skin into the muscle in any other position. Q. State that again? A. The bullet did not make— That is, it's course did not correspond with the location

of the bullet in any other position; that is, with the arm in any other position with relation to the superficial fasciae, and where it was in the muscle.    Q.    Doctor, was that wound a mortal one? A.    It was."    The authorities are conclusive in sustaining the objection of the appellant to the expression of an opinion by the surgeon.    In Brown vs State, 55 Ark. 598, 599, 18 S. W. 1051, 1052, Judge Mansfield says:    "The opinion of an expert is not admissible to prove a matter of common experience and knowledge, upon which any person of ordinary intelligence is capable of arriving at a correct conclusion.    1 Wharton, Ev. § 436; Milwaukee, etc., R. Co. vs Kellogg, 94 U. S. 469, 24 L. Ed. 256; Hammond vs Woodman, 66 Am. Dec. 228, note.    The testimony of medical experts forms no exception to this rule, and a physician or surgeon testifying as such cannot, therefore, give his opinion on a question which the jury was capable of answering without the aid of professional skill and experience.    Cook vs State, 24 N. J. Law, 843.    He may testify whether, in his opinion, a particular wound examined by himself, or described to him in the statement of a hypothetical case, was the cause of death, or was sufficient to produce death.    Ebos vs State, 34 Ark. 520.    He may also give his opinion as to the nature of the instrument which produced a particular wound, the force required to produce it, and whether a given injury could have been inflicted by a weapon of a particular description.    Having examined a wound, a physician may state its direction upon the body; and if its appearance cannot be perfectly described to the jury, and is such as to indicate the direction from which it was received, he may state his opinion as to such direction.    Fort vs State, 52 Ark. 180, 11 S. W. 959, 20 Am. St. Rep. 163.    But his opinion is never admissible to show the position of the body at the time a wound was received nor the position of the person who inflicted it."    In Williams vs State, 17 S. W. 1073 (Court of Appeals of Texas), the court says:    "The witness Alexander testified that he was called professionally to see the injured party,

Cusenberry, the night he was shot, and that he made an examination of his wounds. He was permitted to state that, 'from the appearance of the wounds, I should judge that at the time Cusenberry was shot he was in somewhat of an upright position. * * From an examination of the wounds, I am of opinion that he must have been in an upright position at the time the bullets entered the body.' The opinion of this witness went to show that the theory of the defendant was not true. It 'touched the most sensitive nerve of the defense. It was equivalent to an opinion on the question of his guilt or innocence.' 'Where the jurors are as competent as any other persons to deduce the proper conclusions from a given state of facts, the opinions even of scientific witnesses are not admissible in evidence as to conclusions of inference to be drawn from them.' Cooper vs State, 23 Tex. 331. Expert opinion evidence of medical witnesses is not admissible to prove the relative positions and situations of parties involved in a homicide or an assault with intent to murder." In Thompson vs State, 17 S. W. 449 (Court of Appeals of Texas), the court says: "The state, in order to prove its theory, introduced two physicians who were called in to attend the wounded man; and they, while there, went out and examined the locality of the shooting, and in substance, testified that from the relative position of the two parties, as pointed out to them by the witnesses who saw it, and from the appearances of the wound in the side of the deceased, the relative height of the two parties, and the shots which they saw in a post by the side of the house and a cistern 18 inches high, it was impossible that the deceased could have been standing erect when shot, being much taller than defendant, but that he must have been leaning over forward. This testimony was not objected to by defendant's counsel. Had it been objected to, under the great weight of authority, it was of doubtful admissibility, and perhaps should and would have been excluded. It is not competent for a witness to state his opinion as to the relative position of the parties to a

homicide, either from the appearances of the wounds or other
physical facts.   Where the jury is as competent as any other
person to deduce conclusions from a given state of facts, the
opinion even of scientific witnesses is not admissible in evidence,
as it is a conclusion or inference to be drawn from them." In
State vs Rainsbarger, 74 Iowa, 196, 37 N. W. 153, the court says:
"The counsel for defendant, after stating hypothetically the
condition of the body of the deceased, the character of the
wounds, and other matters, asked a witness, who was a physician,
how the wounds upon defendant were probably made. The
evidence was rightly excluded.   It sought for an expression of
opinion based upon matters which were to be weighed and
considered by the jury, and determined by the exercise of their
own judgments, and not upon the opinion of another.   The
matters upon which the question was based were not peculiarly
within the knowledge of the witness, or of the profession to which
he belonged."   In Dillard vs State, 58 Miss. 387, the court says:
"The shirt worn by the prisoner at the time of the combat,
which was covered with spots of blood, was produced on the
trial; and the prisoner proposed to ask various physicians who
were introduced as experts to give their opinions as to the relative
positions of the combatants at the time of the difficulty, as in-
dicated by the blood upon the shirt, with a view, as was stated,
of showing by the blood marks that the prisoner was probably
prostrate on the ground, and deceased on top of him, when the
stains on the shirt were received.   The court refused to admit
the testimony upon the ground that it was not a matter of science
or of technical skill, but one of common experience and common
sense, as to which the jury must judge for themselves."   As was
said in Williams vs State, supra, the opinion of Dr. Brazl "went
to show that the theory of the defendant was not true.   It
touched the most sensitive nerve of the defense, and was equiva-
lent to an opinion on the question of his guilt or innocence."
What effect this expressed opinion of the doctor had upon the

minds of the jury, no one can say, but we are clearly of the opinion that its admission was error.

The second error assigned was the refusal of the court to permit appellant to continue the examination of the witness James H. Sherro. It appears that the witness was cross-examined at some length as to the manner in which he went through a wire fence, and answered that he went through head foremost. The counsel for appellant asked witness if his head was north or south, the court stated the witness had answered, and an exception was reserved to the ruling of the court. We think the extent of the cross-examination was within the sound discretion of the trial judge, and his ruling will not be disturbed unless it clearly appears that a gross denial of the rights of the appellant is apparent. It does not so appear from the record in this case.

The third error assigned was the admission of a conversation between James Myers, a witness for the prosecution, and James Collins, not in the presence of the defendant. The testimony of said Myers, together with the objections of appellant, the ruling of the court, and the exceptions reserved, is as follows: "Mr. Myers, did any person come to your house on the Sunday morning after the Saturday of the race? A. Yes, sir. Q. Who was it? A. It was James Collins and Bill Couch. Q. State what occurred when they came there? Mr. Cravens: I object to that. Q. Was the defendant Wilson there? A. No, sir; he was not there. Mr. Cravens: I object to his stating a conversation between Collins and Couch and this witness in the absence of the defendant. The Court: This is the man that rode the horse, is it not? Mr. Stuart: Yes, sir. The Court: He may answer. Mr. Cravens: I except. Mr. Stuart: Q. Who come there? A. James Collins and Bill Couch came to my house, and he sent Bill in the house. It was near about twelve o'clock. I was eating my dinner when he came, and he said old

man Collins was out there, and he wanted to see me; and I got up from the table and went out there—went to the buggy out to where he was—and asked him if he wouldn't'get out and come in and eat dinner. I was just eating dinner. And he said no, he didn't want any dinner; and he asked me if he had ever done me any harm, and I told him no, not that I ever knowed of; and he spoke very rough and says, 'You d————n son of a bitch! what did you pull my horse for?' and I says, 'Old man, I never pulled your horse;' and he says, 'Oh, yes; you are a d————n lying son of a bitch;' and I says, 'Old man, you are drunk; I don't want to talk to you;' and I started in the house, and he says, 'Hold on there, d————n you, I'll kill you;' and he got a pistol from behind him and throwed it up in this position, and said, 'D————n you! I will kill you if you don't stop;' and then he cussed me there, I guess, for probably fifteen or twenty minutes. After he got through cussing me, him and Couch got in the buggy and drove on. Mr. Cravens: I will ask to have that excluded, because I say that a conversation between this witness and Collins is immaterial. The Court: The motion is overruled. Mr. Cravens: I except." Greenleaf on Evidence, vol. 3, § 11, says: "It is also a general rule of criminal law in the United States that the party accused is entitled, as of common right, to be confronted with the witnesses against him. This right is declared in the Constitution of the United States, and is also recognized in the constitutions or statutes of nearly all the states in the Union." In Rice on Evidence, vol. 3, § 41, it is said: "Sec. 41. The Attributes of Relevancy. To invest evidence with the attribute of relevancy, it must have a manifest tendency to prove or disprove the allegations of the indictment. Adhesion to this rule will exclude proof of collateral facts incapable of generating a legitimate presumption that they will connect themselves with the question in dispute. A fact sought to be established may be very remote in point of time and place from the issues involved, but, if the trial court can still detect in the evi-

dence offered a tendency to explain the issue, sound policy would insist upon its admissibility. Proffered evidence is always relevant which seeks to show a motive for the crime charged. Green vs State. 12 Tex. App. 51; White vs State, 72 Ala. 195; Russell vs State, 11 Tex. App. 288; State vs Dearborn, 59 N. H. 348." The prosecution insist that there was a conspiracy between Couch and appellant. The rule laid down by Mr. East is as follows: "The conspiracy or agreement among several to act in concert for a particular end must be established by proof before any evidence can be given of the acts of any person not in the presence of the prisoner; and this must, generally speaking, be done by evidence of the party's own act, and cannot be collected from the acts of others, independent of his own, as by express evidence of the fact of a previous conspiracy together, or of a concurrent knowledge and approbation of each other's acts." We have examined the evidence in this case with some care, but we have failed to find any evidence in the most remote degree connecting appellant with any conspiracy between Couch and himself or others. We therefore are of the opinion that the testimony of Myers should not have been received. The counsel for prosecution, in discussing this question, says. "The testimony of Myers upon this point was probably immaterial to the issue, but it necessarily had little, if any, influence with the jury in reaching a verdict." We doubt if it had any influence with the jury, and would not reverse the case by reason of its improper admission.

The fourth assignment of error was the admission of the testimony of Kirby Lamb and Fred Parkinson as to the statements made to them by Wm. Couch after his arrest. The appellant objects upon the ground that there was no sufficient proof of a conspiracy between Couch and the defendant, and that the statements were made some time after the shooting by Couch and after he had left town and been arrested. But counsel

for, appellant apparently overlooked the fact that a predicate was laid, when Couch was on the stand, for the admission of this testimony; that the same questions had been asked Couch. He denied making the statements, and the testimony of Lamb and Parkinson was clearly admissible to contradict him. Then, besides, it appears from the record that the corrected transcript brought up by the certiorari does not show any objections and exceptions were made and reserved to this testimony.

The fifth assignment of error is to a number of instructions given by the court. These instructions are clearly within the law, though, under the proof in the record, the eleventh instruction might be considered an abstract proposition, but no injury could have resulted to the appellant from the giving of the instruction.

The last assignment of error discussed by appellant was the refusal of the court to give the following instruction: "If the jury believe from the evidence that before the fatal shot was fired by Couch the defendant Wilson had in good faith abandoned any intention to participate in the conflict, and was endeavoring in good faith to withdraw from the conflict, they should acquit him." The appellant contends that if he in good faith abandoned any intention to participate in the conflict and was endeavoring to withdraw, he should be acquitted. The appellant, not having fired the shot that killed the deceased, could only have been convicted upon the ground that he aided, abetted, or encouraged Wm. Couch to take the life of the deceased, or that he was a member of a conspiracy to commit the deed. The foregoing instruction is good law as applied to the principal in the crime, but as applied to one aiding, abetting or encouraging the commission of the crime we do not think it goes far enough; and before such a person can be relieved by withdrawing from a participation, and thus be exculpated, he should notify his as-

sociate that he is withdrawing. The following citation is applicable. McClain on Criminal Law, Sec. 198, is as follows: "One of the parties to a combination to do an unlawful act may abandon the common purpose so as to relieve himself from liability for the acts subsequently done in pursuance thereof. But such an abandonment must be evidenced by some act or word calculated to apprise the other confederates of such intention." We are therefore of the opinion that the trial court was correct in refusing the request of the appellant. But for the error in allowing Dr. Brazel to give his opinion as a surgeon, we think this case should be reversed and remanded, and it is so ordered.

GILL and CLAYTON, JJ., concur.